UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROXANNE K. SEGHERS | * | CIVIL ACTION NO. 20-1502 |
| | * | |
| VERSUS | * | SECTION: "J"(1) |
| | * | |
| ANDREW SAUL, COMMISSIONER OF | * | JUDGE CARL J. BARBIER |
| THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ********************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Roxanne K. Seghers, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 15) be GRANTED.

## Procedural Background

Seghers applied for DIB on January 9, 2018, asserting a disability onset date of January 23, 2015. She alleged the following illnesses, injuries, or conditions: depression, anxiety, panic attacks, chronic pain, fibromyalgia, degenerative joint disease, degenerative disc disease, osteoarthritis, spondylosis of lumbar region, chronic neck pain, stenosis, and PTSD. On May 21, 2018, her claim was denied by the state agency. A corrected determination was issued on June 14, 2018. The Disability Determination Explanation concluded:

> Although you are experiencing pain and discomfort due to fibromyalgia,
> degenerative joint disease, osteoarthritis, and disorders of the back, you are still
> able to move about, lift, handle objects, and perform normal activities in a

1

satisfactory manner. Although you have a history of depression, anxiety, panic attacks, and post traumatic disorder, your condition has been treated. Current evidence shows you are able to think, communicate, and care for your own needs. You can get along with others, do your usual daily activities, and remember and follow simple instructions.

. . .

Your condition results in some limitations in your ability to perform work related activities. However, these limitations do not prevent you from performing work you have done in the past as a/an customer service associate, as you described. We have determined that your condition is not severe enough to keep you from working.

R. at 96.

Seghers obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 11, 2019. On August 16, 2019, the ALJ issued an adverse decision. Seghers timely appealed to the Appeals Council, which denied review on April 13, 2020.

On May 21, 2020, Seghers filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 11, 12). The parties filed cross-motions for summary judgment. (Rec. Docs. 14, 15). Seghers is represented by counsel.

## **Evidence in the Record**

*Hearing Testimony*

A hearing was conducted before the ALJ on June 11, 2019. Seghers was represented by counsel. Seghers testified that she worked as a customer service representative at State Farm for over 15 years. R. at 33. In that role she did a lot of computer work and answered the telephones. R. at 34. She also worked as the manager of the nightshift at lasertag. R. at 34. She tried working at H&R Block but said that the lights in the office flickered and after about an hour she would suffer severe migraines. R. at 34. Although she tried to push through, she had to go home and take medicine and lay down in a dark room to help relieve the symptoms. Id. She tried working at a

kiosk at the mall, but the fluorescent lights, the pain from fibromyalgia, and sitting in the stool for a long time caused her to quit. R. at 35.

Seghers testified that she suffers migraines almost daily that last one to three hours. R. at 35. She conceded that Botox injections help for about a month and a half, explaining that she still gets migraines but they are less intense while the Botox is in effect. R. at 35. She noted that Botox injections can only be had every three months, so the other month and a half between injections is more painful. R. at 35-36.

She testified that her migraines are triggered by flickering and fluorescent lights, loud noises, bright lights, and the television. R. at 36. She added that she has arthritis in her neck and shoulder and that too much pain will cause a migraine. Id. Changes in barometric pressure also cause severe migraines. R. at 46. When she has a migraine, she has to turn all the lights off in the house, close the blinds, and go lay down in the silence of her home. R. at 36.

She testified that she has pain, fatigue, nausea, and headaches from the fibromyalgia. R. at 36. Usually the pain is in her left shoulder going up to her neck, her lower back, her right knee, and in her hands. Id. She takes pain pills and muscle relaxers, but they cause drowsiness. Id. She testified that her fibromyalgia is triggered if she does too much, like staying at the grocery store too long, purchasing too many groceries and having to bring them in, driving too long a distance, doing too much housework, being on a computer, or too much walking. R. at 37.

Seghers testified that she can sit for about ten minutes before needing to change position. R. at 37. In the middle of the hearing, she asked to stand. R. at 39. She testified that she can stand for about ten minutes at a time and can walk for about a block or two and back. R. at 37. She testified that the heaviest thing she can lift is a gallon of milk. R. at 38. She testified that she cannot

bend forward because of pressure in her head and cannot kneel because of pain in her right knee. Id.  She testified that she has carpal tunnel syndrome. Id.

With regard to her anxiety and depression, Seghers testified that if she misses her medication, the pain is so great that it will cause an anxiety attack. R. a 39. She said that if she gets overwhelmed at the grocery store, she will start to feel very anxious. Id.  She reported that she had resisted seeing a counselor because she had been sexually abused by her father and brother and felt that seeing a counselor would require she relive that. Id. She testified that the medication she takes for anxiety and depression helps the symptoms, but the memories never go away. Id. Her attorney described her depression as "currently in partial remission" and noted that she has "ups and downs with that." R. at 31

Seghers had surgery to correct her peripheral vision, but she testified that the right eye needs surgery again because not enough skin was removed. R. at 40. She said that driving is scary because of the limits of her peripheral vision. R. at 40.

Seghers testified that she had tried taking college courses recently but had to quit because most of the homework and classroom time involved looking at the computer, which causes migraines. R. at 33. Seghers testified that she only drives a little because being behind the wheel of a car aggravates her shoulder pain and her back. R. at 33. Seghers explained that on a good day, she can do small loads of laundry and cook a simple meal. R. at 39-40. She goes to church about once or twice a month. R. at 40. She goes grocery shopping once a week. Id.

Seghers explained that she left her job with State Farm in 2013 because of anxiety attacks, the fluorescent lighting, and migraines. R. at 41-42. She stayed home from work for six months on short-term disability. R. at 42. She testified that when she went back to work, they told her to go home. Id.  She explained that she had been talking to a nurse before going back into work, but

had not talked to anyone at State Farm and had planned to talk to human resources when she got there. R. at 44. After that, she applied for long term disability, but her claim was denied. R. at 42. She could not recall why. Id.

Vocational expert Karen Harrison testified at the hearing. R. at 49. She classified Seghers' past work as a customer service associate at State Farm as DOT number 205.367-018, which is sedentary, semiskilled, with an SVP of 4. R. at 50. The ALJ asked the expert to consider a hypothetical person of Seghers' age (50), education (12th grade), and work experience, with the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds; stand and walk for four hours in an eight-hour work day; sit for six hours in an eight-hour day; occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; and frequently balance. R. at 51-52. The expert testified that such a person could return to her past work as a customer service associate. R. at 52.

The ALJ next asked the expert to consider the same hypothetical person with additional limitation to understanding, remembering, and carrying out work that was simple, repetitive, and routine involving simple work-related judgment. Id.  The expert testified that such person could not return to her previous work. Id.

Seghers' attorney then asked the vocational expert to consider the same individual as in hypothetical one, but that such person was limited to standing and walking two hours in an eight hour workday and also limited to understanding and remembering simple routine instructions. Id. The expert testified that such an individual could not return to her past work. R. at 52-53.

*Medical Records:*

On April 28, 2014, Seghers presented to Dr. Shikha Singla for evaluation of diffuse pain since 2006. R. at 499. She complained of diffuse pain all over her body, fatigue, and difficulty falling and staying asleep. Id. She reported pain was constant 10/10 without medication and 5/10 on Robaxin and Vicodin. Id. She reported she had quit her job because of pain. Id. She reported that her pain is worse with activity and better with rest and mild exercise. Id. She had 18/18 fibromyalgia tender points. R. at 500. Her range of motion was normal except for her cervical spine, which was restricted. Id. She had full strength in all extremities. Id. She was started on Neurontin (gabapentin). R. at 502. Daily exercise was especially emphasized. Id.

Seghers presented to Dr. Alvin Rouchell on May 5, 2014, to follow up for depression and anxiety. R. at 498. She reported that she continued to have panic attacks and was depressed. R. at 498. She reported she continued to have migraines and was seeing rheumatology for fibromyalgia. Id. Her mood and affect were anxious, depressed, congruent, and appropriate. R. at 499. Her thought processes were normal and logical, and her thought content was normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were adequately but not ideally controlled. Id. General impression was that she continued to be anxious and depressed. Id. No diagnosis was found. Id.

On July 30, 2014, Seghers followed up with Dr. Singla for fibromyalgia. R. at 494. She reported her fatigue had improved and that pain was minimally improved with Neurontin. Id. She reported her pain was constant 10/10 without medications, and 5/10 with Neurontin, Roboxin, and Vicodin. Id. She reported her condition worsened with physical therapy. Id. She was positive for fatigue. Id. Upon physical examination, her neck was supple, she was alert and oriented, her mood and affect were normal, and her range of motion was normal except restricted in the cervical spine

in all directions. R. at 495. She had full strength in all extremities. Id. She was positive for 18/18 fibromyalgia tender points. Id.

She followed up with Dr. Rouchell on August 5, 2014, for depression and anxiety. R. at 492-93. Her mood and affect were anxious, depressed, congruent, and appropriate. R. at 493. Her thought process was normal and logical, and her thought content was normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were adequately but not ideally controlled. R. at 494. General impression was about the same, and there was no diagnosis found. Id.

On September 15, 2014, she called asking to be seen by Dr. Zakem. R. at 491. She said she no longer wanted to be seen by the resident, Dr. Singla. Id. She reported being in extreme pain and that she had experienced an anxiety attack. Id.

She presented to Dr. Jerald Zakem on November 17, 2014 to follow up for chronic pain secondary to fibromyalgia. R. at 491. She reported being unable to work because of the pain. Id. Robaxin and gabapentin were increased; hydrocodone was continued. Id.

On November 19, 2014, Seghers followed up with Dr. Rouchell for depression and anxiety. R. at 489-90. She reported being very stressed about her upcoming disability hearing. R. at 490. She reported having become very angry with her daughter and slapping her. Id. The school notified the authorities and she was awaiting a visit from Child Protective Services. Id. She said she has multiple bad panic attacks daily and is very depressed. Id. Her mood and affect were anxious, depressed, congruent, and appropriate. Id. Her thought process was normal and logical; her thought content was normal. R. at 490-91. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were inadequately controlled. R. at 491. General impression was that her distress was very situational. Id. No diagnosis was found. Id.

On January 20, 2015, Seghers presented at Dr. Khoobehi's office[1] to discuss Botox to relieve migraines. R. at 354. On her intake form, she listed her occupation as "retired." R. at 359. It was noted that she has a strong muscle between the eyes and Botox can relax the muscle. Id. If she gets headache relief from Botox, it was noted that Botox could be repeated or the muscle could be cut. Id.

She followed up with Dr. Zakem on February 24, 2015, for chronic pain and fibromyalgia. R. at 489.

Seghers received Botox injections at Dr. Khoobehi's office on April 6, 2015. R. at 388. It was noted that she wanted Botox to treat headaches. Id.

She followed up with Dr. Zakem on May 22, 2015. R. at 489. She had decreased range of motion in her cervical spine, paravertebral spasm on the left side of the neck, pain on palpation of the lower lumbar spine, and tenderness in the right flank. Id. She was referred to physical medicine for possible soft tissue injections in the neck. R. at 489.

On June 30, 2015, she established care with Dr. Mahmoud Sarmini. R. at 486. She reported that she had been diagnosed with fibromyalgia about seven years earlier. Id. She reported that she was in a motor vehicle accident three years earlier. Id. Although the car sustained minor damage, she started complaining of increasing neck and back pain since. Id. She reported she had been treated conservatively with medication and physical therapy, but had to stop due to increasing pain. Id. She also reported that she had had chiropractic manipulation with some relief. Id. She said her pain had been waxing and waning but had recently gotten worse. Id. She reported her neck pain ranged from 3-4 to 9-10 on a 10 point scale and that her pain was 7-8 on the date of examination. R. at 487. She complained of mild bilateral upper extremity weakness, which she attributed to lack

---

[1] This is the same plastic surgeon who had performed breast augmentation surgery for Seghers in 2004. R. at 349.

of ability to exercise. Id. She reported her back pain was intermittent and ranged from 3-4 to 7-8 on a 10 point scale and her pain was 3-4 on the date of examination. Id. She was positive for fatigue, dizziness, headaches, and sleep disturbance. Id. She had decreased range of motion in her neck. Id. She had full range of motion and strength in her upper and lower extremities and normal gait. R. at 487-88. She was positive for 18 of 18 tender points. R. at 488. She was continued on Ibuprofen, gabapentin was increased, and a home exercise program was encouraged, including stretching for neck muscles. Id.

Seghers followed up with Dr. Rouchell on July 8, 2015, for depression and anxiety. R. at 484. She reported increased anxiety, more panic attacks, and more depression as a result of her children moving away from home, her husband being away with work for two months, and the disability judge finding she could work. R. at 484. She also noted that she tried retail work and physically could not manage it. Id. Dr. Rouchell strongly recommended she consider counseling. Id. Her mood and affect were anxious, depressed, congruent, and appropriate. R. at 485. Her thought process was normal and logical; her thought content was normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were adequately, but not ideally, controlled. Id. General impression was anxious and depressed, with a large situational component. Id.

On July 28, 2015 Seghers received Botox injections at Dr. Khoobehi's office. R. at 387. It was noted that she wanted Botox for migraines. Id.

Seghers followed up with Dr. Zakem on August 26, 2015. R. at 484. She reported feeling worse since her last visit. R. at 484. She was under increased stress due to family problems. Id.

Segehers followed up with Dr. Rouchell for depression and anxiety on September 2, 2015. R. at 482. She reported that her osteoarthritis/fibromyalgia had worsened. Id. She was wearing a

knee brace. Id. Her mood and affect were anxious, depressed, congruent, and appropriate. R. at 483. Her thought process was normal and logical; her thought content was normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were adequately, but not ideally, controlled. Id. General impression was that she continued to be anxious and depressed. Id. No diagnosis was found. Id.

On September 3, 2015, Seghers followed up with Dr. Sarmini. R. at 480. She reported her back pain was worse, ranging from 5 to 9-10 on a 10 point pain scale and 8 on the date of examination. Id. She also reported her neck pain was worse, ranging from 3-4 to 9 on a 10 point pain scale and 5 on the date of examination. Id. She complained of generalized aching and sleep impairment. Id. She was positive for fatigue, dizziness, headaches, and sleep disturbance. R. at 481. She had decreased range of motion in the neck and full range of motion in bilateral upper and lower extremities. Id. She had full strength in all extremities. Id. She was positive for diffuse tender points over the upper and lower back, anterior chest wall, hips, and elbows and knees (noted to be 18 of 18 reference points). Id. Gabapentin was increased, ibuprofen was continued, and a home exercise program was encouraged. R. at 482. Savella was suggested but Seghers preferred to wait. Id.

On September 9, 2015, she received Botox injections at Dr. Khoobehi's office. R. at 386. It was noted that Botox helps her headaches. Id.

The first physical therapy record is from Concentra and is dated September 17, 2015. R. at 344. She had attended 6 sessions for her right knee. R. at 344-45. Seghers reported she was pain free and that she was pleased with her progress in physical therapy. R. at 344. Under treatment status, it was noted that she had no work restrictions. Id. She was discharged from care. R. at 346.

An X-ray of the cervical spine dated September 30, 2015, reflected advanced degenerative change with osteophytes and interspace narrowing seen from C5 through C6-7. R. at 482. No instability on flexion and extension were noted. Id.  Facet hypertrophy bilaterally and uncinate process spurring were seen. Id.

Seghers underwent a partial medial meniscectomy for medial meniscus tear on November 4, 2015. R. at 321.

Seghers returned to Concentra for physical therapy on December 28, 2015. R. at 340. Her chief complaint was pain in the right knee, which she described as aching, sharp, and squeezing. R. at 341. The onset was sudden, the symptoms were intermittent, and she described the pain as mild and improving. Id. She reported her condition was aggravated by bending, prolonged positions, lifting, exercise, and sitting. Id. She reported direct trauma from a falling box. Id.  She noted she was no longer working at her current job. Id.

She had physical therapy at Concentra on January 5, 2016. R. at 337. Active problems were noted to be contusion of the right knee and status post knee surgery. Id.  No significant postural limitations were noted and range of motion was within normal limits. R. at 338.

At her January 14, 2016 physical therapy appointment, she reported that her knee was feeling ok but that her shoulder was bothering her. R. at 334-35. Her range of motion was within normal limits. Id. No significant postural deviations were noted. Id.

On January 15, 2016, she received Botox injections for glabellar and crow's feet at Dr. Khoobehi's office. R. at 384.

Seghers followed up with Dr. Sarmini on February 25, 2016. R. at 477. She reported her neck pain was worse, ranging from 1-2 to 9-10 on a 10 point pain scale and 8 on the date of examination. Id. She reported her back pain was also worse, ranging from 1-2 to 7-8 on a 10 point

pain scale and 5-6 on the date of examination. Id.  She was positive for fatigue, dizziness, headaches, and sleep disturbance. R. at 477-78. She had decreased range of motion in her neck and full range of motion and strength in her upper and lower extremities. R. at 478. She had full strength in all extremities. Id. She was positive for diffuse tender points over the upper and lower back, anterior chest wall, hips, and elbows and knees. Id. Gabapentin was increased, and ibuprofen was continued. Id. A regular home exercise program was encouraged. Id.

She followed up with Dr. Rouchell on March 8, 2016, for depression and anxiety. R. at 475. She reported that she continued to be incapacitated by fibromyalgia and periodic panic attacks and depression. R. at 475. Dr. Rouchell noted her progress toward treatment goals was good. Id. Her mood and affect were anxious, congruent, and appropriate. R. at 476. Her thought process was normal and logical; her thought content was normal. R. at 476. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were adequately but not ideally controlled. Id. General impression was that she was doing better, but she noted that she was having a good day. Id. No diagnosis was found. Id.

Seghers followed up with Dr. Sarmini on May 26, 2016. R. at 473. She reported her neck pain was worse, ranging from 3-4 to 8-9 on a 10 point scale. Id.  Pain was 7-8 on the day of examination. Id.  She also reported worsening back pain, which she reported ranged from 3-4 to 7-8 on a 10 point pain scale. Id.  She reported pain of 7-8 on the day of examination. Id.  She reported staying active generally and regularly going to the gym. Id. She was positive for fatigue, visual disturbances, arthralgias, back pain, neck pain, neck stiffness, dizziness, headaches, and sleep disturbance. R. at 473-74. She was negative for gait problems and behavioral problems. R. at 474. She had decreased range of motion in her neck and full range of motion and strength in her upper and lower extremities. Id.  She had full strength in all extremities. Id. She was positive for

diffuse tender points over the upper and lower back, anterior chest wall, hips, and elbows and knees. Id.  MRIs of the cervical and lumbar spine were ordered. R. at 475. Gabapentin was increased. Id. Aleve, Norco (hydrocodone-acetaminophen), and methocarbamol were continued. Id.  A regular home exercise program was encouraged. Id.

An MRI of the lumbar spine without contrast was performed on June 2, 2016. R. at 527.  It showed mild degenerative changes of the lower lumbar spine. Id.  An MRI of the cervical spine was obtained on the same date and showed mild cervical degenerative changes most pronounced at C6-C7. R. at 524. Moderate right-sided and mild left-sided neural foraminal narrowing and mild spinal canal stenosis was also noted. Id.

June 7, 2016, Seghers followed up with Dr. Rouchell for depression and anxiety. R. at 471. She reported that she continued to work on her fibromyalgia and osteoarthritis and that she was exercising regularly. Id.  She reported that she was planning to return to school and get training as a surgical tech. Id.  It was noted that she is intelligent enough to handle school, but "whether she is physically able is unclear." Id.  Dr. Rouchell noted that Seghers' progress toward treatment goals was good. Id.  Her mood and affect were anxious, congruent, and appropriate. R. at 472. Her thought process was normal and logical, her thought content was normal, and her associations and insight were intact. Id.  Dr. Rouchell noted that her problems were well controlled. Id.  General impression was that she was doing better. Id.  No diagnosis was found. Id.

On June 8, 2016, Dr. Sarmini called Seghers to discuss the MRI reports. R. at 471. Seghers reported that she felt gabapentin was causing excess sedation. Id.  The dosage was altered. Id.

Seghers followed up with Dr. Sarmini on July 28, 2016. R. at 468-69. She reported her back pain was under fair control. R. at 469. Her maximum pain was 6/10 and minimum was 3-4/10. Id.  On the day of examination her pain was 3-4. Id.  Her neck pain was about the same,

ranging from a maximum of 9 to a minimum of 4-5 on a 10 point scale. Id. On the day of examination her pain was 4-5. Id. She reported fatigue, poor energy, and infrequent interruptions of her sleep. Id. Upon physical examination she had limited range of motion in her neck and full range motion in her upper and lower extremities. R. at 469-70. She had full strength in all extremities. Id. She was positive for diffuse tender points over the upper and lower back, anterior chest wall, hips, and elbows and knees. R. at 470. She had normal mood and affect. Id. She was not interested in cervical epidural steroid injections. Id. Gabapentin was increased; Aleve, Norco, and methocarbamol were continued. Id. A regular home exercise program was encouraged. Id.

She returned to Dr. Rouchell on September 7, 2016, for a psychiatry follow up. R. at 467. She reported that she had attended school for a week, but was then bedridden for 3 days and had to drop out. Id. Dr. Rouchell again encouraged therapy. Id. Dr. Rouchell noted that Segehrs' problems were adequately, but not ideally, controlled. R. at 468. General impression was about the same. Id. No diagnosis was found. Id.

Seghers received Botox injections with Dr. Khoobehi on August 8, 2016. R. at 395. It was noted that areas of concern were glabellar and crow's feet. R. at 396.

She followed up with Dr. Sarmini on October 27, 2016. R. at 465. It was noted that Seghers had an MRI of the cervical spine that was positive for facet arthropathy with neural foraminal stenosis, but that she declined referral for steroid injections. Id. She was maintained on gabapentin. Id. She complained of diffuse aching. Id. Her maximum pain was 9/10 and minimum pain was 4-5/10. Id. Pain was 8/10 on the day of examination. Id. She reported that her sleep was still impaired, and she complained of fatigue, though she was still able to go up 3-4 flights of stairs. Id. She had decreased range of motion of the neck and tenderness of the cervical spine. R. at 466. She had full range of motion and strength in her bilateral upper and lower extremities. Id. She had full

14

strength in all extremities and her gait was normal. Id. She was positive for diffuse tender points over the upper and lower back, anterior chest wall, and hips. Id. Gabapentin was increased, and Norco and methocarbamol were continued. Id.  A home exercise program was encouraged. Id.

Seghers presented to Dr. Colin Van Hook on November 29, 2016. R. at 461. She reported experiencing headaches for many years that occur about 3 to 4 days per week and last hours to days. R. at 462. She reported attempting to avoid triggers, such as using electronics, but she still has frequent headaches. R. at 462. She reported getting Botox injections across her forehead by Dr. Khoobehi for the past three years from which she feels a mild benefit. R. at 462. On a review of systems, she was negative for fatigue, dizziness, decreased concentration, and dysphoric mood. Id.  She was positive for back pain, myalgias, neck pain, and headaches. Id.

Progress notes by Dr. Celeste Dolan dated November 29, 2016 indicate that Seghers reported headaches since she was a teenager. R. at 464. They last from hours to days about three days per week and more often with known triggers. Id. Seghers reported receiving Botox with good relief for the past three years. Id.  She reported that she prefers to use natural remedies prior to prescription medications. Id.

Seghers presented for physical therapy with Gerard Britsch on December 12, 2016. R. at 458. She rated pain at 8 out of 10. Id.  She reported her activities of daily living were limited by pain. R. at 459. She returned for physical therapy on December 20, 2016. R. at 458. She reported 4 days of relief with dry needling, but complained of pain over the past 2 days because of a fibromyalgia flare up. Id. She rated her pain as 5 out of 10. Id.  At her December 28, 2016, physical therapy appointment, she tolerated dry needling well with decreased tenderness to palpation afterwards. R. at 457. She reported pain as 3/10. Id.

She returned to physical therapist Britsch on January 4, 2017, and reported her neck was stiff and she had pain of 2 out of 10. R. at 456-57. She tolerated dry needling well on the right with decreased tenderness to palpation afterwards, but she tolerated dry needling poorly on the left. R. at 457. It was noted that she had overall no symptom relief with dry needling. Id. Due to lack of progress and continued pain, Britsch concluded Seghers would not continue to benefit from skilled physical therapy intervention. Id.

Seghers presented to Dr. Sarmini on January 23, 2017, for follow up. R. at 454-55. She reported her energy/fatigue had been worse, she continued to have interrupted sleep, and her pain was diffuse but mostly in her back and neck. R. at 455. Upon a review of symptoms, she was positive for fatigue, visual disturbance, arthralgias, back pain, neck pain, neck stiffness, dizziness, headaches, and sleep disturbance. Id. She was negative for gait problems and behavioral problems. Id. On physical examination she had decreased range of motion in her neck and full range of motion in her upper and lower extremities. R. at 455-56. She had full strength in all extremities and her gait was normal. Id. She was started on a buprenorphine patch and Fiorinal (butalbital-aspirin-caffeine). R. at 456. Gabapentin was increased and Norco was continued. Id. A home exercise program was encouraged. Id.

On January 24, 2017, Dr. Van Hook spoke with Seghers about her headaches and recent discharge from physical therapy for worsening fibromyalgia pain during sessions. R. at 454. She was reluctant to attempt any medication for migraine prophylaxis because she felt she was constantly in a "fibro fog," but agreed to a trial of topiramate and Imitrex. R. at 454. Dr. Van Hook recommended she be seen by a headache specialist for consideration of Botox for headache. Id.

Seghers presented to Sidney Jackler, MPA, on February 6, 2017, complaining of headache. R. at 451. The following impressions were noted: intractable persistent migraine aura with cerebral

16

infarction and status migrainosus, occipital neuralgia, unspecified laterality, anxiety, rebound headache, and history of fibromyalgia. Id. It was noted that she was already receiving Botox. Id. She reported she did not want any more medications because they were making her sick. Id.

She followed up with Dr. Sarmini on March 23, 2017, to follow up. R. at 448. She reported she had recently been under physical and emotional stress. Id. She was working a part time job 4:00 – 8:30 p.m. R. at 448. She reported her back pain had been worse and her neck pain had been slightly worse. Id. She continued to complain of generalized aching, poor energy, and interrupted sleep. Id. Upon a review of systems, she reported fatigue, visual disturbances, arthralgias, back pain, neck pain, and neck stiffness. R. at 449. She had decreased range of motion in her neck, but full range of motion in her bilateral upper and lower extremities. Id. She had full strength in all extremities and her gait was normal. Id. She was positive for diffuse tender points. Id. She was assessed with fibromyalgia, chronic neck pain, cervical degenerative joint disease, cervical facet arthropathy, neural foraminal stenosis of the cervical spine (moderate at C6-7), chronic midline low back pain without sciatica, and spondylosis of lumbar region without myelopathy or radiculopathy. R. at 450. Gabapentin was increased; Norco, methocarbamol, and Fiorinal were continued. Id. A regular home exercise program was encouraged. Id.

Seghers received Botox injections at Dr. Khoobehi's office on April 4, 2017. R. at 404. The "area of concern" was noted to be "Botox for migraines." Id.

A mental status evaluation was performed by Carlos B. Reinoso, Ph.D., on May 8, 2017. R. at 411-13. Dr. Reinoso diagnosed Seghers with post-traumatic stress disorder and unspecified depressive order due to PTSD. Id. Her behavior was normal, her speech was clear, and her levels of expression were adequate for communication purposes. R. at 412. Her thought processes were linear and goal direct, and her thought content was appropriate. Id. She was alert with normal

concentration, adequate persistence, and adequate pace of response. Id. Her mood was largely euthymic. Id. She reported stable family relations and that she can get along with others, but she has trouble trusting men. Id. She reported that she had been sexually abused by her father and brother as a child and that her first two husbands had cheated on her leading her to have issues trusting men. R. at 411. She reported experiencing flashbacks with associated anxiety and anger directed at her brother who abused her, and she reported experiencing periods of depression when she dwells on events she has experienced. Id. Mild limitations in activities of daily living and mild limitations in socialization were reported. R. at 412. Dr. Reinoso concluded that Seghers was likely of average intelligence. Id. Dr. Reinoso concluded that from a psychological standpoint, Seghers may have mild difficulties in relating to co-workers or superiors and mild difficulty in handling work pressures in a work setting. Id. Dr. Reinoso concluded that Seghers could understand, carry out, and remember moderate instructions. R. at 412-13.

Seghers followed up with Dr. Rouchell on June 1, 2017, for depression, anxiety, and chronic pain. R. at 445. She reported she was unable to handle a part time job at H&R Block and reported feeling guilty about not bringing in some money. Id. Dr. Rouchell again talked about the benefits of therapy. Id. Seghers' mood and affect was anxious and depressed. R. at 446. Her thought process was normal and logical, her thought content was normal, and her insight was intact. Id. Dr. Rouchell noted that Seghers' condition was adequately, but not ideally, controlled. Id. General impression was depressed; no diagnosis was found. R. at 446.

On August 8, 2017, Seghers presented to Dr. Stacy Siegendorf, to establish care. R. at 443. She reported that she had been sexually abused as a child by her father and brother, that her first husband had cheated on her, and that her second husband had committed suicide when their children were 5 years and six months old. Id. She reported suffering chronic depression and pain.

18

Id. She was positive for dysphoric mood. Id. She was assessed with osteoarthritis of the spine with radiculopathy, cervical region; chronic migraine without aura with status migrainosus, not intractable; depression; panic disorder; and fibromyalgia. R. at 444.

Seghers returned to Dr. Zakem, on August 11, 2017 to follow up for fibromyalgia and osteoarthritis. R. at 442. It was noted that she has generally been stable and was doing some exercise. R. at 442. She had decreased range of motion in her cervical spine, but good range of motion of all joints and unremarkable shoulders, elbows, knees, ankles, and feet. Id.

She followed up with Dr. Sarmini on August 29, 2017, reporting that her pain had been worse. R. at 440. She described her neck pain as constant aching in the low cervical spine with occasional tingling sensations. R. at 440. She reported her pain was worse with activity and better with rest. R. at 440. She reported her maximum pain was 9 out of 10 and her minimum was 3 or 4 out of 10. Id. Upon physical examination, she had decreased range of motion in her neck. R. at 441. Her gait was within normal limits and her bilateral upper and lower extremities exhibited full range of motion. Id. She had full strength in all extremities and her gait was normal. Id. She was positive for diffuse tender points. Id. She had normal mood and affect. Id. Gabapentin was increased. R. at 442. She was continued on Norco, methocarbamol, and Fiorinal. Id. She was started on trazadone for insomnia. Id. A home exercise program was encouraged. Id.

Seghers presented to Dr. Fawad Khan on September 11, 2017, R. at 437. She reported daily headaches lasting over four hours with a range of intensity. R. at 437. Symptoms associated with the headaches included meningeal symptoms, nausea/vomiting, visual blurriness, impaired concentration, and neck pain. R. at 438. Physical examination, including psychiatric, was normal. R. at 439. She was assessed with chronic neck pain; chronic migraine without aura with status

migrainosus, not intractable; fibromyalgia; and polypharmacy. R. at 439. No medication was prescribed. R. at 439. Botox on or around October 31 was planned. R. at 439.

On September 19, 2017, Seghers was seen by Dr. Andrew Lawton, on referral from Dr. Khan. R. at 436. Seghers reported constant migraines of 9 on the pain scale. Id. She reported that her right eye gets blurry with headaches. R. at 436. She reported trigger point injections in the past that improved her right sided headache for about 6 weeks. Id. She was referred to Dr. Sahu for evaluation for possible surgical repair of bilateral ptosis. Id. She was assessed with chronic migraine without aura with status migrainosus, not intractable. Id.

Dr. Priya D. Sahu conducted a ptosis evaluation on October 3, 2017, R. at 435.

Seghers followed up with Dr. Rouchell on October 31, 2017, for depression, anxiety, and chronic pain. R. at 433. Dr. Rouchell encouraged her to consider therapy. R. at 434. Her thought process was normal and logical and her judgment and behavior were adequate under the circumstances. R. at 434-35. Her mood and affect were anxious, depressed, congruent, and appropriate. R. at 434. Dr. Rouchell noted that Seghers' problems were improved. R. at 435. General impression was anxiety and depression. R. at 435. Diagnosis was major depressive disorder, recurrent episode, mild degree and panic disorder. Id.

She followed up with Dr. Khan on November 9, 2017, for a fibromyalgia flare up. R. at 431. It was noted that she had Botox for cosmetic reasons on October 19, 2017. Id. She was assessed with chronic neck pain; chronic migraine with aura status migrainosus, not intractable; fibromyalgia; and polypharmacy R. at 432. Dr. Khan discussed the risk of developing an immune response to Botox by receiving treatment within a few weeks of cosmetic Botox. R. at 433. She proceeded with injections. Id.

Bilateral upper lid blepharoplasty surgery was performed on December 22, 2017 and Seghers was discharged the same day. R. at 593.

She followed up with Dr. Sarmini on March 22, 2018. R. at 927. She reported that aching had been significantly worse over the past three months. Id. She admitted she had been under emotional duress due to illness of her daughter, eye surgery, and financial hardships. R. at 927-928. She reported her back pain was constant, ranging from 4-5 to 9 on a 10 point pain scale. R. at 928. Her back pain was at 9 on the date of examination. She reported her neck pain was a constant aching sensation with pain ranging from 4-5 to 9 on a 10 point scale. Id. Her pain was 9 on the date of examination. Id. It was noted that she had been given a prescription for Oxycodone for severe pain and that she used it occasionally with better relief. Id. She was positive for fatigue, arthralgias, back pain, neck pain, neck stiffness, dizziness, headaches, and sleep disturbance. Id. She was negative for gait problems and behavioral problems. Id. She had decreased range of motion in her neck, but full range of motion and strength in her upper and lower extremities. R. at 928-29. She had full strength in all extremities and her gait was normal. Id. She was positive for diffuse tender points. R. at 929. She was started on Celebrex; Gabapentin was increased; and Norco, Percocet (oxycodone-acetaminophen), methocarbamol, and Fiorinal were continued. R. at 929-30. A regular home exercise program was encouraged. R. at 930.

On April 3, 2018, Seghers followed up with Dr. Rouchell. R. at 933. She reported she was not doing well and that multiple events in her life had increased her anxiety and depression. R. at 933. Her father had died in November, triggering painful memories and turmoil in the family about inheritance. Id. She reported her pain had been 10 on a 10 point scale. Id. She reported that she had to see a chiropractor after paddle boarding over the weekend. Id. Dr. Rouchell again explained the benefits of psychotherapy to cope with chronic pain, past history of abuse, current family

conflicts, and filing for disability. Id.  She reported she had been unable to follow through on the recommendation in the past because of financial reasons but would check if her insurance covered counseling. Id.  Her mood and affect were anxious, depressed, congruent, and appropriate. R. at 934. Her thought process was normal and logical and her thought content was intact. R. at 934-35. Her associations and insight were intact. Id.  Dr. Rouchell noted that her problems were inadequately controlled. Id.  Diagnoses were major depressive disorder, recurrent episode, mild degree; panic disorder; and post-traumatic stress disorder. Id.

Based on a review of the medical records, state agency reviewer Johnny B. Craig, M.D., assessed Seghers' residual functional capacity on April 19, 2018. R. at 93-94. Dr. Craig opined that Seghers was limited to lifting 20 pounds occasionally and 10 pounds frequently, that she could stand and/or or walk (with normal breaks) for four hours and sit (with normal breaks) for a total of 6 hours in an 8 hour workday. Id. Dr. Craig explained that these limitations were required because of chronic low back and neck pain secondary to degenerative joint disease, degenerative disc disease, and/or spondylosis. Id.  He noted that her pain was exacerbated by weight bearing, that her motor/sensory was intact, and that she  had diffuse muscle pain and fatigue with modest exertion from fibromyalgia. Id. He also limited her to climbing, stooping, kneeling, crouching, and crawling occasionally and balancing frequently. Id.  Dr. Craig concluded that Seghers' allegations of functional limitations can be attributed to documented medical impairments, but that the alleged severity of the pain, fatigue, and functional loss was more severe than would be expected from the objective physical findings. Id.

Seghers followed up with Dr. Khan on May 17, 2018. R. at 1103. She reported she was dissatisfied with recent plastic surgery and reported her headaches were more frequent in the frontal eye region. R. at 1103. She was positive for headaches and fatigue. R. at 1106. She was

assessed with chronic neck pain; chronic migraine without aura with status migrainosus, not intractable; fibromyalgia; and polypharmacy. Id.

Seghers followed up with Dr. Rouchell on May 21, 2018. R. at 1110. She was upset because she had been denied social security the day before. Id. She had a fibromyalgia flare up. Id. Dr. Rouchell encouraged therapy Id. Her mood and affect were anxious, depressed, irritable, congruent, and appropriate. R. at 1111. Her thought process and thought content were normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted her problems were adequately but not ideally controlled. R. at 1112. She was diagnosed with major depressive disorder, recurrent episode, moderate degree. Id.

Seghers returned to Dr. Sahu on June 12, 2018, to follow up. R. at 955. She reported having chronic migraines with no relief from Botox with Dr. Khan. Id. She reported she had not had any Botox injections since February 2018 to show how her eyelids are still drooping. R. at 956. She reported she constantly has to raise her eyebrows to see and it makes her migraines worse. Id. She complained of photophobia and experiencing discomfort when touching the right eye. Id. Dr. Sahu planned a surgery to remove a small ellipse of skin in the temporal quadrant of left upper lid. Id.

Seghers followed up with Dr. Rouchell on August 16, 2018, for depression and anxiety. R. at 1115. She was having a difficult time, citing a migraine affecting the right side of her head. R. at 1116. She reported receiving "the death certificate," which triggered a worsening of her grief. Id. They discussed augmenting Lexapro with Abilify. Id. Dr. Rouchell noted her problems were adequately but not ideally controlled. R. at 1117. General impression was anxiety and depression. Id. Diagnosis was major depressive disorder, recurrent episode, moderate degree; panic disorder; and PTSD. Id.

Seghers followed up with Dr. Khan on August 16, 2018. R. at 1123. She reported headaches that are frequently disabling. Id. She was not interested in pursuing Botox. Id. She was positive for headaches and fatigue. R. at 1125. It was noted that her headaches resolve with sleep. R. at 1125. A list of medications tried was provided. Id. It was noted that Fioricet and Lexapro did not help. Id. Seghers was assessed with chronic neck pain; chronic migraine without aura with status migrainosus, not intractable; fibromyalgia, and polypharmacy. R. at 1126.

On September 17, 2018, Seghers presented to Dr. Siegendorf. R. at 963. She was positive for visual disturbance and headaches. R. at 963. Upon physical examination, some ptosis due to failed ptosis surgery was noted. Id. She had a normal mood and affect. Id. She was positive for headaches and visual disturbance. Id. Dr. Siegendorf ordered MRIs of the brain for Seghers' chronic mixed headache syndrome with some intermittent visual disturbance. Id. at 964. A triamcinolone acetonide injection were administered and a methylprednisolone pak was dispensed. Id.

On September 26, 2018, Seghers presented to Dr. Sahu for bilateral modified Fasanella-Servat, left upper eyelid blepharoplasty, and bilateral upper eyelid thermal cauterization. R. at 971. She followed up with Dr. Sahu on October 2, 2018, and October 23, 2018, and reported doing well. R. at. 986, 994.

On October 24, 2018, Seghers followed up with Dr. Rouchell. R. at 1130. She reported being significantly less depressed and anxious. Id. She attributed this to Abilify and forgiving her brother on her birthday last week through prayer. Id. Her mood and affect were euthymic, congruent, and appropriate. R. at 1131. Her thought process was normal and logical, and her thought content was normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted

her problems had improved and the general impression was that she was doing better. Id. Diagnosis was recurrent major depression in partial remission. R. at 1132.

She followed up with Dr. Sahu on November 29, 2018. R. at 1001. She continued to be bothered by a very small amount of temporal dermatochalasis bilaterally. Id.  Her history of migraines and Botox treatment was noted. Id. Dr. Sahu noted that Seghers had mild temporal brow ptosis. Id.  No further surgical intervention was recommended, but Dr. Sahu discussed the likely benefit of temporal sub brow Botox injections to help elevate the temporal brow. Id.

Seghers returned to Dr. Sarmini on November 29, 2018. R. at 1006. It was noted that she had been lost to follow up and had returned to the clinic to reestablish care. Id.  She reported that her neck pain had been stable, with pain ranging from 5-6 to 7-8 on a 10 point pain scale. Id. Pain was 7-8 on the date of examination. Id. She reported that her low back pain had been stable, with pain ranging from 4-5 to 7-8 on a 10 point pain scale. Id. Her back pain was 5-6 on the day of examination. Id. She was positive for fatigue, visual disturbance, arthralgias, back pain, neck pain, neck stiffness, dizziness, and headaches. R. at 1007. She was negative for gait problems and behavioral problems. Id.  She had decreased range of motion in her neck and full range of motion and strength in her upper and lower extremities. R. at 1007-08. She had full strength in all extremities and her gait was normal. Id. She was positive for diffuse tender points. R. at 1008. She was continued on Celebrex, Neurontin, Adderal-XR, and Norco. Id. A regular home exercise program was encouraged. Id.

On December 14, 2018, Dr. Sarmini filled out a form evaluating Seghers' impairments. R. at 943. He noted she has been diagnosed with fibromyalgia, chronic low back and neck pain, and degenerative joint disease of the lumbar and cervical spine. R. at 943. He reported that she was not a malingerer. Id.  He opined that her pain and symptoms are severe enough to constantly interfere

with the attention and concentration needed to perform even simple work tasks. R. at 944. He also opined that she is incapable of tolerating even minimal work stress. Id. He opined that Seghers could walk half a block, sit for ten minutes before needing to get up, and stand for ten minutes before needing to sit down or walk around. Id. He opined that she could sit for less than two hours in an 8 hour workday and stand or walk for less than a total of 2 hours in an 8 hour workday. Id. He reported that she would need to include periods of walking around during an 8 hour workday. Id.

Dr. Sarmini opined that Seghers needs a job that permits shifting position at will from sitting, standing, and walking. R. at 945. He reported that she did not need a cane. Id. He opined that she would sometimes need to take unscheduled breaks in an 8 hour workday. Id. He opined that she could lift up to 10 pounds occasionally, but never lift 20 pounds or more. Id. He opined that she could rarely twist, stoop, and climb stairs, that she could occasionally stoop, and that she could never climb ladders. R. at 945-46. He opined that she could occasionally look down, turn her head, and look up, and that she could frequently hold her head in a static position. Id. He opined that she could use her hands for grasping, turning, and twisting objects for 10% of an 8 hour workday, use her fingers for fine manipulation for 20% of the workday, and use her arms to reach, including overhead, for 10% of the workday. R. at 946. He opined that her condition is likely to produce good days and bad days. Id. He opined that she would likely be absent from work more than four days per month as a result of her impairments or treatment. Id.

On January 16, 2019, Seghers followed up with Dr. Khan. R. at 1138. It was noted that her headaches were overall controlled with Botox. Id. She was positive for fatigue and headaches. R. at 1140. Dr. Khan noted she was in status migrainosus and that Botox could be continued. R. at 1141. It was noted she had no side effects from Aimovig and that it would also be continued. Id.

She received Botox injections. Id. She was assessed with chronic neck pain; chronic migraine without aura with status migrainosus, not intractable; fibromyalgia that causes worsening headaches; and eye strain that provokes headaches. Id.

Also on January 16, 2019, Dr. Khan filled out a form evaluating Seghers' impairments. R. at 949. He opined that she suffers from migraines occurring for at least once a week for 3 consecutive months despite adherence to prescribed treatment. R. at 947. He also opined that her migraines occur at least once every 2 months for at least 4 consecutive months and result in a marked limitation in physical functioning; marked limitation in understanding, remembering, or applying information; marked limitation in interacting with others; marked limitation in concentrating, persisting, or maintaining pace; and marked limitation in adapting or managing herself. Id. He also opined that she could sit less than 2 hours in an 8 hour workday and stand or walk less than 2 hours in an 8 hour workday. Id. He opined that she could rarely lift up to 10 pounds, and never lift 20 pounds or more. R. at 948. He opined that her symptoms would be severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks. R. at 948. He opined that her impairments would be likely to produce good days and bad days. Id. He estimated that Seghers would be absent from work more than four days per month as a result of her impairments or treatment. Id.

Seghers followed up with Dr. Rouchell on January 24, 2019. R. at 1146. It was noted that she continued with fibromyalgia and migraines. Id. Dr. Rouchell also noted that her mood and anxiety were under good control. Id. Her mood and affect were euthymic, congruent, and appropriate. R. at 1147. Her thought process was normal and logical and her thought content was normal. Id. Her associations and insight were intact. Id. Dr. Rouchell noted her problems had

improved. Id.  General impression was anxiety/depression. Id.  Diagnosis was recurrent major depression in partial remission. Id.

Seghers followed up with Dr. Sarmini on March 21, 2019. R. at 1014. She reported her neck pain was constant and aching and ranged from 4 to 7-8 on a 10 point pain scale. R. at 1015. Her back pain was also stable. Id.  She described the pain as constant and aching and as shooting to her hips. Id.  The pain ranged from 5-6 to 7-8 on a 10 point pain scale. R. at 1015. She had decreased range of motion in the neck and full range of motion in the bilateral upper and lower extremities. R. at 1016. She had full strength in all extremities and her gait was normal. Id. She was positive for diffuse tender points. Id. She reported that Celebrex was too expensive and she was interested in trying Naproxen. R. at 1015. She was started on Naproxen sodium Id. Gabapentin, Adderall XR, Norco, Percocet, and Lioresal (baclofen) were increased. Id.  A regular home exercise program was encouraged. Id.

On April 10, 2019, Seghers followed up with Dr. Khan. R. at 1153. She reported her headaches were overall controlled with Botox. Id.  She reported she had started seeing a chiropractor. Id. Botox injections were administered. R. at 1157.

She followed up with Dr. Rouchell on April 24, 2019 for anxiety and depression. R. at 1161. She reported being in the middle of a fibromyalgia flare up. Id.  Anxiety and depression were fairly well contained. Id.  Her mood and affect were anxious, congruent, and appropriate. R. at 1162. Her thought process was normal and logical and her thought content was normal. Id.  Her associations and insight were intact. Id.  It was noted that her problems are well controlled. Id. General impression was that she was doing ok and her diagnosis was recurrent major depression in partial remission. Id.

Her records contain various chiropractic records. She treated with Henry Fitch at Advanced Back Care on April 14, 2014; May 14, 2014 through June 15, 2014; September 29, 2016 through April 19, 2017; and June 19, 2017 through April 9, 2018.  R. at 822, 840, 938. She treated at Chiropractic Health Center and Holistic Health Care Services from June 4, 2018 to August 23, 2018. R. at 1063-98. She treated with Impastato Chiropractic on March 26, 2019; April 4, 2019; April 5, 2019; April 8, 2019; April 11, 2019; April 15, 2019; April 26, 2019; April 29, 2019. R. at 1035-54. She reported neck and lower back pain that ranged from 6 to 8 on a ten point scale. Id.

## Decision of the Administrative Law Judge

The ALJ found that Seghers meets the insured status requirements of the Act through March 31, 2020. The ALJ determined that Seghers had not engaged in substantial gainful activity since January 23, 2015, the alleged onset date. The ALJ found that Seghers has the following severe impairments: fibromyalgia and degenerative disc disease of the cervical and lumbar portions of the spine. The ALJ found that Seghers' migraines and ptosis/visual disturbance, singly and in combination, are "non severe" because they are no more than slight abnormalities with such a minimal effect on Seghers that they would not be expected to interfere with her ability to perform work-related activities. The court also found that Seghers' mental impairments of posttraumatic stress disorder and major depressive disorder, singly and in combination, are "non severe" because they do not cause more than a minimal limitation in Seghers' ability to perform basic mental work activities. The ALJ next determined that Seghers does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that Seghers has the residual functional capacity to perform light work as defined by the regulations, except that she is able to occasionally lift and/or carry twenty pounds

and frequently lift and/or carry ten pounds; stand and/or walk for a total of four hours in an eight-hour workday, and sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and frequently balance. Relying on the testimony of the vocational expert, the ALJ found that Seghers is capable of performing her past relevant work as a customer service associate because that work does not require performance of work-related activities precluded by her residual functional capacity. Thus, the ALJ concluded that Seghers has not been under a disability as defined in the Act from January 23, 2015 through the date of decision.

### Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ erred in failing to find that Seghers' migraine headaches, depression, and anxiety are severe impairments.

Issue No. 2.    Whether the residual functional capacity assessed by the ALJ is supported by substantial evidence.

### Analysis

#### I.   Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B.,

305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.   Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

<u>Perez</u>, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." <u>Id.</u> Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. <u>Id.</u>  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. <u>Id.</u>

**III.    <u>Plaintiff's Appeal</u>**.

*Issue No. 1.    Whether the ALJ erred in failing to find that Seghers' migraine headaches, depression, and anxiety are severe impairments.*

    *a.  Parties' Arguments*

Plaintiff argues that the ALJ's finding that Seghers' headaches are not a severe impairment because they were noted as overall controlled by Botox as of January 2019 is contrary to the medical records and her testimony. She points out that in the cited medical record, Dr. Khan noted that she was in status migrainous and continued Aimovig and administered Botox. Further, on the same day, Dr. Khan stated that despite treatment, Seghers suffered from weekly migraines affecting her physical functioning, that the migraines would frequently interfere with the attention and concentration needed for simple tasks and would cause her to miss more than 4 days of work per month. She points out that a few days after her visit with Dr. Khan, she told Dr. Rouchell that she continued to experience ongoing pain from fibromyalgia and migraines. She also notes that she testified at the hearing that although Botox helps her experience less intense migraines, it does not eliminate her pain. She also testified that Botox decreases the intensity of her pain for 90 days but she can only get the injections every 3 months. She submits that Dr. Khan's records indicate

that she had failed multiple treatments for migraines.[2] She argues that the entirety of the records prove that her migraines occur frequently enough and affect her functioning so much that she is unable to work on the days she has migraines. She submits that there is no medical opinion that finds her migraines to be non-severe or that contradicts Dr. Khan's findings. She argues she was prejudiced by the ALJ's findings because the ALJ did not consider the effects that the migraines would have on her ability to be present at work 8 hours per day, 5 days per week.

Plaintiff further argues that her depression plagued her on and off throughout the years and affected her functioning. She points out that the consultative examiner found that her depression would interfere with her ability to handle work pressure. Thus, she insists, the ALJ should also have found that her depression was a severe impairment. She asks the court to remand for further consideration of her headaches and depression.

The Commissioner responds that plaintiff's migraines and depression were not severe impairments. He submits that, as the ALJ discussed, these conditions were controlled. The Commissioner submits that the treatment records of Dr. Khan and others reflect that plaintiff's headaches were "not intractable," meaning they could be controlled. The Commissioner cites Dr. Khan's notes indicating that plaintiff experienced no side effects from migraine prescription medication that worked alongside Botox. The Commissioner points out that plaintiff was not compliant with Dr. Khan's advice by taking Botox for both cosmetic and migraine purposes more frequently than the necessary three month window between injections to avoid anti-bodies that would render Botox ineffective. The Commissioner cites treatment records from plaintiff's plastic surgeon Dr. Khoobehi showing administration of Botox for both headaches and wrinkles. The Commissioner describes Dr Khan and Dr. Sarmini's notes that plaintiff complained Botox was not

---

[2] The cited record notes that Fioricet and Lexapro did not help, Imitrex helps, and that her Botox treatments in August 2017, November 2018, and February 2018 helped. R. at 1125. The other medications are listed without notation. Id.

controlling her headaches as occasional. The Commissioner argues that plaintiff's providers consistently found her headaches to be controllable and that when she followed their advice, they were controlled, which indicates her migraines were not functionally limiting and would not be severe impairments at step two.

The Commissioner argues that plaintiff's depression was also controlled. He cites Dr. Rouchell's records showing that she was compliant and did not experience side effects. The Commissioner points out that although Dr. Rouchell encouraged plaintiff to seek cognitive behavioral therapy, she chose not to because of the cost and a reluctance to discuss her past. She watched self help videos on YouTube instead. The Commissioner argues that the records of Dr. Khan cited by the plaintiff are internally contradictory in that he noted her anxious and depressed mood, yet normal and logical thoughts, insight, judgment, orientation, memory, attention, concentration, and fund of knowledge, with no examples to explain why he listed anxiety or depression. The Commissioner points out that at the hearing, plaintiff's attorney described her depression as in "partial remission" and plaintiff testified that her depression medication relieved her symptoms and that she refused to see a counselor because she preferred to avoid discussing the past.

The Commissioner argues that claimants must follow prescribed treatment plans if compliance would restore the claimant's ability to work and that if the claimant fails to do so without good cause, the ALJ cannot find that the claimant is disabled. See 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."); Johnson v. Sullivan, 894 F.2d 683, 685 n. 4 (5th Cir. 1990) (noting that even if the claimant was found to be disabled, he would not be entitled to recover benefits because he failed to follow the prescribed treatment

regimen, specifically, his orthopedist concluded from the film he observed that the claimant was not wearing a prescribed back brace).  The Commissioner argues that failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment. Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005) (noting that the claimant's "failure to seek treatment for depression is an indication of nondisability").

Further, the Commissioner submits that plaintiff fails to acknowledge that this case was not decided until step four and that, therefore, there was no prejudice against her because the ALJ's analysis went beyond the step two severity finding. See Jones v. Bowen, 829 F.2d 524, 527 n.1 (5th Cir. 1987) (finding that the ALJ properly concluded that the claimant's hypertension was of mild severity, but noting that the ALJ proceeded through the sequential evaluation to conclude at the fourth and fifth level that the claimant could perform past relevant work and that, therefore, there was no error as in a case where benefits were prematurely denied based on an improper determination of non-severity). The Commissioner argues that the ALJ properly determined Plaintiff's severe impairments, and because the ALJ proceeded beyond step two, any alleged error at step two is no longer relevant.

    *b.  Analysis*

The court finds that the ALJ did not err in finding that Seghers' migraine headaches, depression, and anxiety are not severe impairments. The regulations provide that an impairment or combination of impairments is "non-severe" when "it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.922(a); § 404.1522(a). Basic work activities include physical functions (e.g., walking, standing, sitting, lifting); understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work

setting. Id.  The Fifth Circuit has explained that an impairment is "not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting Estran v. Heckler, 745 F.2d 340, 341 (5th Cir. 1984)); see Titles II & XVI: Med. Impairments That Are Not Severe, SSR 85-28 (S.S.A. 1985).

With regard to migraines, the ALJ considered that Seghers' treating physician, Dr. Khan, noted her headaches were overall controlled with Botox as of January 2019.  As the Commissioner points out, Dr. Khan consistently diagnosed Seghers' migraines as "not intractable." Plaintiff points out that Dr. Khan diagnosed her as in status migrainosus, continued Aimovig, and administered Botox on the same day that he found her headaches controlled by Botox.  But continued treatment of her migraines is not inconsistent with Dr. Khan's assessment that her migraines were controlled with treatment. She notes that on the same day in January 2019 as his treatment notes reflect her migraines were controlled, Dr. Khan also filled out a check box questionnaire opining to severe symptoms and impairments. As discussed further below, it is the check box questionnaire that is inconsistent with Dr. Khan's treatment notes that consistently describe her migraines as "not intractable" and explicitly note her migraines are controlled with Botox in both January and April 2019. Seghers submits that her treatment record with Dr. Khan shows that she had failed multiple treatments for migraines. The cited record lists numerous medications and notes that Fioricet and Lexapro did not help, but that Imitrex and Botox helped. This record is not inconsistent with Dr. Khan's determination that Seghers' headaches were controlled. Seghers also cites her hearing testimony that Botox reduces the intensity of her headaches for only the first month and a half after injections but that she must wait three months

between injections. The ALJ considered Seghers' testimony, R. at 15, but ultimately found Dr. Khan's assessment that her headaches were controlled to be determinative. The court finds that substantial evidence supports the ALJ's determination that her migraines were non-severe, even though another conclusion might have been possible. See Dubose v. Mathews, 545 F.2d 975, 976 (5th Cir. 1977) ("Although we might have reached a different conclusion, we hold that there is substantial medical evidence to support the Secretary's determination.").

With regard to her depression and anxiety, the ALJ considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental impairments. First, the ALJ considered what are known as the "Paragraph B" criteria. See 20 C.F.R. Relying on the findings of consultative examiner Dr. Reinoso, the ALJ found Seghers has no limitation in the area of understanding, remembering, or applying information; mild limitation in the area of interacting with others; mild limitation in the area of concentrating, persisting, or maintaining pace; and mild limitation in the area of adapting or managing oneself. The ALJ then concluded that Seghers' mental impairments are non-severe "[b]ecause they cause no more than 'mild' limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities." R. at 13. The ALJ also determined that the conclusions of the state agency psychiatric reviewer Joseph Tramontana, Ph.D., support these findings.

In support of her argument that her depression should have been found severe, the plaintiff argues that her depression plagued her "off and on" for many years. Without further explanation, she cites her March 8, 2016, and April 3, 2018, visits with Dr. Rouchell. Seghers treated with Dr. Rouchell for anxiety and depression from at least May 2014 through April 2019. In October 2018, January 2019, and on April 24, 2019, he consistently noted that her anxiety and depression were

under control and that her problems had improved or were under control. R. at 1130-32, 1146-67, 1161-62. Prior to that, he regularly noted that her problems were "adequately but not ideally controlled," that her problems had improved, or on one occasion, that her problems were "well controlled." R. at 435, 446, 468, 472, 476, 483, 485, 494, 499 1112, 1117. Dr. Rouchell only found her problems inadequately controlled on April 3, 2018, and November 19, 2014. R. at 491, and 934-35.

Seghers also cites consultative examiner Dr. Reinoso's opinion that she "may have difficulty in handling work pressures in a work setting." R. at 412. Dr. Reinoso's report specifically supports each of the ALJ's findings regarding the Paragraph B Criteria. He opined that substantial cognitive defects were not evident and Seghers was likely of average intelligence. R. at 412. He also opined that she could understand, carry out, and remember moderate instructions. R. at 412-13. He noted that only mild limitations in socialization were reported, that she reported she can get along with others, and that she reported her family relations were stable. R. at 412. He found "[s]he demonstrated normal concentration, adequate persistence, and adequate pace of response." Id. He further found that she could manage her own finances. Id. He noted that she reported she can prepare basic foods, dress, feed, bathe, and meet her hygiene needs herself, but that she could not do basic chores. Id. Because each of the ALJ's findings regarding the Paragraph B Criteria are supported by Dr. Reinoso's report, substantial evidence supports the ALJ's conclusion that the Paragraph B Criteria had not been met.

As to Dr. Reinoso's opinions that Seghers "may" have difficulty handling work pressures in a work setting, the ALJ found this portion of the opinion was not persuasive because it was vague and unsupported by his findings on examination. The court agrees that Dr. Reinoso's

findings do not support Seghers' claim that he found her depression "would" interfere with her ability to handle work pressure.

The records of Dr. Rouchell and Dr. Reinoso cited by Seghers do not contradict the records relied on by the ALJ or the ALJ's assessment of her depression and anxiety. The court finds the ALJ's finding that Seghers' depression and anxiety are not severe is supported by substantial evidence.

In any event, as the Commissioner points out, the ALJ did not deny benefits on the basis of a finding that Seghers' depression and migraines were not severe. Instead, the ALJ proceeded to step four. The ALJ considered all of the medical records, including Seghers' allegations of migraines and depression, in determining her residual functional capacity. As a result, the ALJ's findings at step two are non-prejudicial. Even if the ALJ had found her migraines and/or depression to be severe, the ALJ would have proceeded to assess the entire record to determine her residual functional capacity as the ALJ did here. A purported omission by the ALJ at step two is an irrelevant claim of error if the ALJ's analysis proceeds beyond step two. Compare Jones, 829 F.2d at 527 n. 1 (rejecting the claimant's challenge to the ALJ's severity finding at step two because the ALJ had proceeded through the full sequential evaluation process) and Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (rejecting the claimant's argument that the ALJ had employed the wrong standard to assess whether his impairment was severe because the ALJ proceeded through the full analysis and ultimately determined that the claimant could return to his past relevant work) with Stone v. Heckler, 752 F.2d 1099, 1106 (5th Cir. 1985) (reversing the ALJ's decision where the incorrect "severity" standard was applied at Step 2 and the ALJ denied the claim on the basis that the claimant had no severe impairment).

*Issue No. 2.   Whether the residual functional capacity assessed by the ALJ is supported by substantial evidence.*

### a.  Parties' Arguments

Plaintiff argues that the ALJ failed to include all of her limitations in her residual functional capacity. She argues that the medical records clearly show that she suffers from chronic pain, headaches, and depression that affect her ability to hold even a part time job. She notes that Dr. Sarmini and Dr. Khan independently noted that her pain would frequently interfere with the attention and concentration needed to perform even simple work tasks. She argues that these opinions are well supported by the record. She submits that Dr. Sarmini's treatment notes include findings of multiple tender points, non-restorative sleep, chronic fatigue, fibro fog, frequent severe headaches, depression, and diffuse pain during flare-ups. She points out that tender points were positive at almost all examinations. She also cites her treatment records with Dr. Van Hook, to whom she reported 3-4 headaches per week, lasting for hours, with associated photo/phonophobia, blurred vision, and dizziness. She also reported that she was anxious of taking more medications because she was in a constant state of fibro fog. She further cites the opinion of the consultative examiner Dr. Reinoso that she would have mild difficulty in relating to co-workers and supervisors and would have difficulty handling work pressure.

Plaintiff argues that the ALJ picked and chose evidence that supported the ALJ's position to the exclusion of contrary evidence. She further argues that there is no legal basis for the ALJ to reject the two opinions of Dr. Khan and Dr. Sarmini because both have a long-time treating relationship with plaintiff and both are specialists in their fields. Citing the testimony of the vocational expert, she argues that had the ALJ given appropriate weight to the opinions of Dr. Khan and Dr. Sarmini, the ALJ would have been compelled to grant benefits.

The Commissioner responds that the ALJ took care to consider the entire record as a whole and to notice the progression of plaintiff's health. The Commissioner argues that the ALJ complied with Social Security Ruling (SSR) 96-8 by providing a narrative discussion of the evidence supporting her determination and resolving inconsistencies in the evidence as a whole. The Commissioner notes that the new rules applicable to plaintiff's application no longer refer to the "weight" to be assigned to the opinions of various medical providers. Instead, the regulations require the ALJ to focus on the supportability of the opinion, the consistency of the opinion with evidence from other sources, the relationship of the provider with the claimant, the specialization of the medical source, and other factors, such as evidence that the medical source has familiarity with the other evidence in the claim or an understanding of the Social Security Administration disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c.

The Commissioner further argues that the ALJ was correct to determine that the three-page questionnaires completed by Dr. Khan and Dr. Sarmini were non-persuasive because neither contained any support for the assertions therein. The Commissioner argues that the ALJ may properly disregard unsupported, brief, and conclusory statements that lack explanations, examinations, or objective tests. The Commissioner submits that check-the-box forms typify brief and conclusory statements. Nonetheless, the Commissioner points out, the ALJ considered the persuasiveness of the forms before determining them unsupported. The ALJ concluded that the limitations in the questionnaire responses were disproportionate to the providers' own treatment notes. The ALJ also determined that both responses failed to reflect that plaintiff's headaches were overall controlled with Botox by January 2019 and through at least April 2019. The Commissioner adds that the ALJ also compared the questionnaires to plaintiff's own testimony that she still drove, shopped, attended church, washed laundry, and prepared meals.

The Commissioner further submits that Dr. Sarmini's responses were internally contradictory in that he marked that she needed unscheduled breaks to walk every ten minutes that would last ten minutes, but also that an eight-hour workday would only consist of less than two hours of standing/walking. The Commissioner submits that Dr. Sarmini checked various "medical findings" without providing any substance, while his treatment notes indicate his findings were unremarkable—such as full strength of all extremities and normal gait despite alleged pain. The Commissioner submits that plaintiff's citation to Dr. Sarmini's notes reflecting plaintiff's subjective complaints of tender points does not amount to objective medical evidence. The Commissioner argues that when subjective complaints are not supported by objective medical evidence, the ALJ has discretion to discredit them. The Commissioner points out that Dr. Sarmini noted that plaintiff was "generally staying active and goes to the gym regularly" and that he prescribed a home exercise program for her, which the Commissioner argues belies plaintiff's argument that her pain was uncontrolled. The Commissioner further submits that other providers also noted that her pain improved with mild exercise, that exercise was especially emphasized, that her exercise tolerance was good, and that she was doing some exercise despite pain.

As to the questionnaire filled out by Dr. Khan, the Commissioner submits it is similarly defective because it contains unanswered questions, unsupported assertions about lifting limitations, and a simplistic checkbox response about whether plaintiff had good days and bad days, neither of which was defined or connected to any particular limitation. The Commissioner submits that Dr. Khan's treatment record shows successful treatment of headaches with Botox. The Commissioner argues that although Dr. Khan marked that she had pain that frequently interfered with attention and concentration, the questionnaire failed to define "frequently" before the question was posed. The Commissioner submits that Dr. Khan's notes are internally consistent

when they indicate her headaches were both controlled and not intractable, yet had features of being uncontrolled. The Commissioner points out that despite plaintiff's allegations of functionally limiting pain, Dr. Khan encouraged regular exercise. The Commissioner rejects plaintiff's argument that the entire record supports Dr. Khan's conclusions because plaintiff cites only one note from Dr. Van Hook's treatment records dated at least three years before the records show her headaches were under control.

As to consultative examiner Dr. Reinoso, the Commissioner submits that plaintiff has failed to explain why the Commissioner should have deferred to his May 2018 examination. The Commissioner argues that the ALJ considered Dr. Reinoso's opinion and properly found nothing in Dr. Reinoso's notes that supported additional limitations in the residual functional capacity. Dr. Reinoso observed that plaintiff had no limitations in concentration, he identified no more than mild limitation in any functional area under step two, and he noted that she presented within normal limits and presented nothing remarkable. The Commissioner argues that Dr. Reinoso's conclusions are supported by the psychiatric review by the initial disability determination examiner Dr. Tramontana.

The Commissioner further argues that the ALJ is not obligated to defer to medical notes about job-related functions such as the frequency of symptoms that would interfere with attention and concentration or ability to work alongside others because the ALJ has other resources like vocational expert testimony about potential work the plaintiff could perform. The Commissioner insists that the residual functional capacity is properly supported.

The Commissioner challenges the plaintiff's characterization of the ALJ's conclusions as substituting her own medical opinions for that of the medical professionals. The Commissioner argues that only the Commissioner and not a doctor can make a legal determination of disability

and insists that the residual functional capacity decision is the province of the Commissioner. The Commissioner argues that it is the responsibility of the ALJ to interpret the medical evidence and determine a claimant's capacity for work. The Commissioner argues that the plaintiff bears the burden to prove that her functional limitations preclude her from performing her past work.

b. *Analysis*

The court finds that the ALJ's residual functional capacity assessment is supported by substantial evidence. Plaintiff argues that additional limitations should have been included to reflect her migraines, depression, and chronic pain. Of course the residual functional capacity includes exertional limitations. But plaintiff argues that her pain would interfere with the attention and concentration needed to perform even simple work tasks. She cites the questionnaires that Dr. Khan and Dr. Sarmini filled out. Each of these questionnaires was filled out after Seghers had retained counsel and was appealing the decision of the state agency. The physicians checked boxes or blanks in response to prompts. Such forms have been viewed with suspicion when they are not adequately supported by medical evidence. DeJohnette v. Berryhill, 681 F. App'x 320, 321–22 (5th Cir. 2017) ("[T]he ALJ was well within its discretion to conclude that [the treating psychiatrist's] checking a single box on a single form without any supporting medical evidence did not outweigh the other substantial record evidence supporting a finding of no disability."); DeJohnette v. Berryhill, 681 F. App'x 320, 321–22 (5th Cir. 2017) ("[T]he ALJ was well within its discretion to conclude that [the treating psychiatrist's] checking a single box on a single form without any supporting medical evidence did not outweigh the other substantial record evidence supporting a finding of no disability."). Courts have also questioned the objectivity of such opinions when they appear to be created in anticipation of litigation. E.g., Johnson v. Soc. Sec.

44

Admin., No. CV 15-4811, 2016 WL 6902115, at *4 (E.D. La. Sept. 23, 2016), report and recommendation adopted, No. CV 15-4811, 2016 WL 6892878 (E.D. La. Nov. 23, 2016).

Here, Dr. Sarmini responded to the question "To what degree can your patient tolerate work stress?" by circling "Incapable of tolerate [sic] even minimal stress." R. at 944. When asked "How often during a typical work day is your patient's experience of pain or other symptoms severe enough to interfere with attention and concentration to perform even simple work tasks," he checked the response "Constantly." Id. He described her impairments as chronic low back pain, degenerative joint disease of the lumbar spine and chronic neck pain, degenerative joint disease of the cervical spine and described her pain as chronic and frequent. R. at 943. But he otherwise provided no explanation for his opinions regarding her "pain or other symptoms" and their effect on her attention and concentration or her ability to tolerate work stress.

Plaintiff had last treated with Dr. Sarmini on November 29, 2018, at which time (like every previous visit) she was negative for gait problems and she had full range of motion and strength in all extremities. R. at 1006-07. She reported her neck and low back pain had been stable, ranging from about 4 to 8 on a 10 point pain scale. Id. As he had throughout his treatment of the plaintiff, Dr. Sarmini encouraged a home exercise program. Id. Dr. Sarmini noted she had been lost to follow up; her previous visit with him had been about 8 months earlier on March 22, 2018. R. at 927. The ALJ found Dr. Sarmini's conclusions were disproportionate with his own treatment notes and concluded that his statement was not persuasive. Indeed, despite consistently encouraging a home exercise program[3] and his findings regarding her strength and range of motion,[4] his statement

_____

[3] In May 2016 he noted that Seghers was exercising and going to the gym regularly and in October 2016 he noted that although she complained of fatigue, she could still climb 3 to 4 flights of stairs. R. at 465, 473.

[4] Plaintiff submits that Dr. Sarmini checked the boxes on the questionnaire for multiple tender points, nonrestorative sleep, chronic fatigue, fibro fog, frequent severe headaches, and depression. The medical records show that Dr. Sarmini's medical findings include multiple tender points. Dr. Sarmini's records also reflect that Seghers consistently reported fatigue, sleep disturbances, and headaches. The only reference to depression in Dr. Sarmini's records is to

45

opines that she could stand for no more than 10 minutes at a time, walk no more than half a block, and only occasionally lift up to 10 pounds. His conclusions regarding her attention, concentration, and ability to tolerate work stress do not appear to be supported by his treatment notes, which do not contain any observations or reports regarding same. As the Commissioner points out, "checklist opinions are unworthy of credence when they are not adequately supported by or are inconsistent with the medical records." Bienemy v. Astrue, No. CIV.A. 11-616, 2012 WL 910229, at *8 (E.D. La. Feb. 13, 2012), report and recommendation approved, No. CIV.A. 11-616, 2012 WL 913114 (E.D. La. Mar. 14, 2012). The undersigned concludes that the ALJ's finding that Dr. Sarmini's December 2018 statement is not persuasive is supported by substantial evidence.

Plaintiff also cites the statement of Dr. Khan dated January 16, 2019. He responded to the question "How often during a typical work day is your patient's experience [sic] symptoms severe enough to interfere with attention and concentration to perform even simple work tasks?" by checking "Frequently." R. at 948. He offered no narrative explanation for this opinion. He reported that she suffered from migraines and checked the responses indicating that she had "migraines occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." R. at 947. The form contains no other diagnoses or symptoms.

The ALJ found Dr. Khan's statement was not persuasive because the limitations assessed were disproportionate with his own treatment notes. As the ALJ pointed out, on the same day Dr. Khan filled out the referenced form, his treatment notes indicate that Seghers' headaches were overall controlled with Botox. R. at 1138. His notes again reflect headaches overall controlled with Botox on April 10, 2019. R. at 1153. Dr. Khan's treatment notes consistently diagnose "chronic

note a past medical history of anxiety/depression. The only reference to fibro fog in the medical records is one report to Dr. Van Hook on January 24, 2017.

migraine without aura with status migrainosus, *not intractable*." R. at 432, 436, 439, 444, 1106, 1126, 1141 (emphasis added). Plaintiff fails to address these records in arguing that Dr. Khan's check-box questionnaire response should not have been discounted. Instead she cites a treatment record from November 29, 2016, when she reported to Dr. Van Hook that her headaches occurred three to four days per week and lasted hours to days. R. at 461-62. This was almost a year before she began treating with Dr. Khan. She also cites the report of consultative psychological examiner Dr. Reinoso who opined that Seghers "may have mild difficulty in relating to co-workers or supervisors" and "may have difficulty in handling work pressures in a work setting." R. at 412. It is unclear how Dr. Reinoso's opinions support Dr. Khan's check box questionnaire response that Seghers' symptoms would "frequently" be severe enough to interfere with attention and concentration to perform even simple work tasks. Seghers argues that the ALJ was picking and choosing records to support the ALJ's conclusion. To the contrary, the ALJ correctly found Dr. Khan's responses to the questionnaire were disproportionate with his own treatment notes. The court finds substantial evidence supports the ALJ's assessment of Dr. Khan's questionnaire response.

Although the plaintiff does not appear to challenge the ALJ's assessment of Dr. Reinoso's opinions, the court notes that the ALJ found them generally persuasive, except for his opinion that she "may" have difficulty handling work pressures in a work setting. The ALJ found that opinion vague and unsupported by Dr. Reinoso's findings on examination. Indeed, as the ALJ observed, Dr. Reinoso found Seghers could understand, carry out, and remember moderate instructions. Dr. Reinoso noted that Seghers reported mild limitations in socialization, but he also noted that she reported that she can get along with others. Her behavior was normal, her levels of expressive and receptive language were adequate for communication, her thought processes were linear and goal

oriented, and no problems were noted with attention, impulsivity, or hyperactivity. She demonstrated normal concentration, adequate persistence, and an adequate pace of response. And she reported no limitations in concentration. Her effort and motivation were adequate. The court finds no error in the ALJ's assessment of Dr. Reinoso's opinion.

As the Commissioner points out, "[i]t is the responsibility of the ALJ to interpret 'the medical evidence to determine [a claimant's] capacity for work.'" Fontenot v. Colvin, 661 F. App'x 274, 277 (5th Cir. 2016) (quoting Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012)). Here, that is exactly what the ALJ did and substantial evidence supports the ALJ's conclusions. This court may not re-weigh the evidence or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461. The ALJ's decision not to include additional limitations related to the effects of her migraines, depression, and chronic pain on concentration and attention in Seghers' residual functional capacity is supported by substantial evidence and must be affirmed.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. ) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. ) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 2nd day of June, 2021.


Janis van Meerveld
United States Magistrate Judge